J-A26008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| IZENA GOUDY | : | |
| | : | |
| Appellant | : | No. 2380 EDA 2019 |

Appeal from the Judgment of Sentence Entered July 16, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0006888-2017

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MARCH 9, 2021**

Appellant, Izena Goudy, appeals from the judgment of sentence of life imprisonment, without the possibility of parole, imposed after a jury convicted him of, *inter alia*, first-degree murder, 18 Pa.C.S. § 2502(a).  We affirm.

We need not reiterate the procedural history and factual background of this case, as the trial court set forth a comprehensive summary of both in its December 23, 2019 opinion pursuant to Pa.R.A.P. 1925(a).  *See* Trial Court Opinion (TCO), 12/23/19, at 1-33.  On appeal, Appellant raises three issues for our review:

> [1.] The evidence was insufficient to sustain the verdict of guilty of murder of the first degree because the Commonwealth did not prove beyond a reasonable doubt that Appellant committed an intentional killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate[,] and premeditated killing.

---

[*] Former Justice specially assigned to the Superior Court.

[2.] The evidence was insufficient to sustain the verdict of guilty of murder of the third degree because the Commonwealth did not prove beyond a reasonable doubt that Appellant caused the death of the victim.

[3.] The trial court erred when[,] on May 30, 2019[,] it failed to grant Appellant's motion *in limine* with respect to a portion of a statement made by witness Shante Fernandez. Ms. Fernandez was permitted to testify that Appellant asked Fernandez if the victim had a security system in his home. Pa.R.E. 403 and 404(b).

Appellant's Brief at 7 (unnecessary capitalization and emphasis omitted).

We have reviewed the thorough and well-reasoned opinion issued by the Honorable Richard M. Cappelli of the Court of Common Pleas of Delaware County. We conclude that Judge Cappelli's opinion accurately and thoroughly disposes of the issues raised by Appellant. **See** TCO at 4, 33-38, 39-41, 43-45.[1] Accordingly, we adopt his opinion as our own with respect to the issues Appellant raises on appeal. We direct the parties to attach the trial court's opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

---

[1] Appellant set forth other issues in his Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal that he does not raise in his brief. We express no opinion on the trial court's discussion of the merits of those abandoned claims.

J-A26008-20

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/09/2021

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

**COMMONWEALTH OF PENNSYLVANIA**

v.

**IZENA GOUDY**

**NO. CP-23-CR-6888-2017**

**2380 EDA 2019**

**CAPPELLI, J.**                    **DECEMBER 23, 2019**

## OPINION

Appellant appeals from the Judgment of Sentence entered on July 16, 2019.

Appellant's claims are without merit and Judgment of Sentence should be affirmed.

## I. BACKGROUND

On September 6, 2017, Appellant was arrested and charged with: 18 Pa.C.S. § 2501 Criminal Homicide; 18 Pa.C.S. §2502(a) Murder of the First Degree; 18 Pa.C.S. §2502(a) Murder of the Third Degree, Felony of the First Degree; 18 Pa.C.S.§ 907(a) Possessing Instruments of Crime, Misdemeanor of the First Degree. The Commonwealth alleged on or around May 7, 2007 Appellant murdered Gary Jenkins ("Victim Jenkins") using a dumbbell and a knife at 128 Reese Street in

Sharon Hill, Delaware County, PA. Victim Jenkins' body was found in his home, wrapped in a comforter and covered in towels. Victim Jenkins had been beaten, stabbed, and his head nearly decapitated. A blood covered thirty pound dumbbell was found at the scene of the murder. Following the murder, Appellant moved to New York City, enlisted in the Army National Guard, and began transitioning her gender from female to male, including undergoing a bilateral mastectomy and beginning a lifelong regimen of testosterone injections. In 2015, Appellant was linked to the murder following a "hit" on the national DNA databank CODIS.[1]

Following a jury trial, on May 30, 2019, Appellant was convicted of Murder of the First Degree, Murder of the Third Degree, and Possessing Instruments of Crime. On July 16, 2019, Appellant was sentenced to a term of confinement of Life without Parole for the murder of the first degree conviction (the sentence for the murder of the third degree conviction merged) and a 30 month minimum to a 60 month maximum for the conviction of Possessing Instruments of Crime to run consecutive to the life without parole sentence. Appellant did not file any post-sentence motions. *See* Pa.R.Crim.P. 720. On August 14, 2019, Appellant filed a Notice of Appeal. *Id.*, and Pa.R.A.P. 903. On August 19, 2019, an order was entered directing Appellant to file a Concise Statement of Errors Complained of on Appeal

---

[1] This information concerning the DNA and CODIS is not a part of the trial testimony and was not considered by the jury.

2

Pa.R.A.P. 1925(b), and on October 4, 2019, following an order extending time to file, Appellant filed the 1925(b) Statement alleging the following errors:

1.    The evidence was insufficient to sustain the verdict of guilty of Murder of The First Degree because the Commonwealth did not prove beyond a reasonable doubt that Appellant committed an intentional killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

2.    The evidence was insufficient to sustain the verdict of guilty of Murder of The Third Degree because the Commonwealth did not prove beyond a reasonable doubt that Appellant caused the death of the victim.

3.    The evidence was insufficient to sustain the verdict of guilty of Possession of an Instrument of Crime because the Commonwealth did not prove beyond a reasonable doubt that Appellant possessed a firearm or other weapon concealed upon his person with intent to employ it criminally.

4.    The Trial Court erred when on May 30, 2019 it failed to grant Appellant's Motion in Limine with respect to limiting the testimony of Dara Raynah Jones. Jones was permitted to testify that her relationship with Appellant was volatile. Pa.R.E. 403 and 404(b).

5.    The Trial Court erred when on May 30, 2019 it failed to grant Appellant's Motion in Limine with Respect to a portion of a statement made by Shante Fernandez. Ms. Fernandez was permitted to testify that Appellant asked Fernandez of the victim had a security system in his home. Pa.R.E. 403 and 404(b).

6.    The Trial Court erred when on May 30, 2019 it failed to grant Appellant's Motion in Limine with Respect to the Presence of Appellant's DNA in the national databank. Pa.R.E. 403 and 404(b). Appellant's DNA was not found on the murder weapon. The victim's and an unknown person's DNA was found on the murder weapon.

7.    The Commonwealth improperly replied to Appellant's allocution when it stated that the physical evidence was at odds with

3

allocution and that allocution contained no remorse. The Defense made a timely objection. NT 7-16-19 P 19.

Appellant's claims lack merit and Judgment of Sentence should be affirmed.

The crimes and offenses to which Appellant was convicted are defined in Title 18 of the Pennsylvania Crimes Code. The Crimes Code defines the offense of Murder of the First Degree in relevant part: "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." *See* 18 Pa.C.S. § 2502(a). The Crimes Code defines "intentional killing" as "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." *See* 18 Pa.C.S. § 2502(d). To establish Appellant committed the offense of Murder of the First Degree, the Commonwealth must have proven beyond a reasonable doubt victim Gary Jenkins is dead, Appellant killed Gary Jenkins, and Appellant killed Gary Jenkins with the specific intent to kill and with malice.

The Crimes Code defines the offense of Murder of the Third Degree in relevant part: "All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree." *See* 18 Pa.C.S. § 2502(c). To establish Appellant committed the offense of Murder of the Third Degree, the Commonwealth must have proven beyond a reasonable doubt victim Gary Jenkins is dead, Appellant killed Gary Jenkins, and Appellant killed Gary Jenkins with malice.

4

The Crimes Code defines the offense of Possessing Instruments of Crime in relevant part: "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." *See* 18 Pa.C.S. § 2502(a). The Crimes Code defines "instrument of crime" in relevant part as "anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have" and "weapon" in relevant part as "anything readily capable of lethal use and possessed under circumstances not manifestly appropriate for lawful uses which it may have." *See* 18 Pa.C.S. §907(d). To establish Appellant committed the offense of Possessing Instruments of Crime, the Commonwealth must have proven beyond a reasonable doubt Appellant possessed a dumbbell and/or a knife, the dumbbell and/or knife was an instrument of crime, and Appellant possessed the dumbbell and/or knife with intent to employ it criminally.

## II. TRIAL SUMMARY

The record of the jury trial in this matter reveals the Commonwealth presented a clear, concise, and compelling case for Appellant's guilt and convictions. At trial, the Commonwealth elicited testimony from several witnesses, building the case against Appellant in a methodic and logical manner, beginning with the discovery of Victim Jenkins' body, followed by the criminal investigation and analysis of evidence at the crime scene including blood evidence matched through DNA to

5

Appellant, the testimony of witnesses that Appellant before the murder inquired about the existence of an alarm system at Victim Jenkins' residence and whether Victim Jenkins was living alone, and testimony Appellant admitted in 2013 to having killed a man by beating him to death. The Commonwealth presented a cogent theory of the case against Appellant from: 1) the direct observations of the lay witnesses, police and detectives who investigated the case, and experts who provided opinions within a degree of medical and scientific certainty concerning Victim Jenkins' manner of death and the identification of DNA found at the scene of the murder; 2) the totality of the circumstances surrounding the murder; 3) photographs of Victim Jenkins' home depicting the property at the time of the murder, photographs of Victim Jenkins' body in the comforter when discovered, photographs of blood spatter and blood stains, and records from the medical examiner concerning Appellant's brutal and deadly attack of Victim Jenkins; 4) presentation of physical evidence found at the scene of the murder; and 5) lab reports, medical reports, police reports resulting from the investigations in this case.

The record discloses Appellant presented a less compelling case that included Appellant's dissonant and rationalized testimony. Following a thorough *colloquy* by counsel and the court, Appellant waived the right to not testify and stated on the record he understood: the decision to testify is Appellant's decision to make and Appellant could not be compelled to testify; his testimony would be subject to direct

6

examination by defense counsel and cross-examination by the Commonwealth; if Appellant did not testify, no negative inference could be drawn. *See generally* May 30, 2019 Notes of Testimony at pp. 94-96. Appellant called three witnesses and presented some of Appellant's medical records from April 2007, photographs of Appellant's graduation from West Philadelphia Highschool and swearing in ceremony from when Appellant enlisted in the Army National Guard. Appellant's case summary discloses: Appellant testified she beat Victim Jenkins because he raped her and took her virginity; Appellant testified she did not murder Victim Jenkins but is responsible for his death; Appellant testified her now deceased father actually killed Victim Jenkins; Appellant's aunt testified Appellant came to her home and *inter alia* Appellant told her she had been in a really big fight; Appellant's grandmother testified Appellant told her Victim Jenkins raped her. Based on Appellant's conviction of murder of the first degree and all other charges, it is clear the jury as finder of fact believed the facts presented by the Commonwealth proved the criminal charges beyond a reasonable doubt and was not persuaded the facts elicited by Appellant on cross examination and during the presentation of Appellant's case assuaged Appellant's guilt.

A review of the pertinent trial record reveals the following:

## A. COMMONWEALTH'S CASE

### 1. Testimony of Gregory Shelton, Employee at CAPP. *See generally* May 28, 2019 Notes of Testimony at pp. 42-54.

Gregory Shelton ("Shelton") testified he has worked for 30 years at CAPP in Clifton Heights, PA. *Id.* at 42-43. Shelton testified he knew Victim Jenkins as a fellow employee from when he started working at CAPP. *Id.* at 43. Shelton testified Victim Jenkins was the "Thermal Coupler Shop Manager." *Id.* at 44. Shelton testified Victim Jenkins was a "very good employee" and "very reliable, very dependable, honest". *Id.* Shelton testified the last time he saw Victim Jenkins was Friday, April 27, 2007. *Id.* at 46-47. Shelton testified the following Monday Victim Jenkins did not show up for work *Id.* at 47-48. Shelton testified Victim Jenkins had mentioned he was going on vacation, and on the following Monday, May 7, 2007 Victim Jenkins again did not show up for work and did not call into CAPP. *Id.* at 48-49. Shelton testified the owner of CAPP suggested they drive to Jenkins house and knock on the door. *Id.* at 49. Shelton testified he drove over to Jenkins home, and he observed some newspapers, an open window, and an open shed. *Id.* Shelton testified no one answered when he knocked on the door. *Id.* Shelton testified he took the newspapers to the door and placed them there, and he observed mail at the door. *Id.* at 53. Shelton testified he called 9-1-1 to request a wellness check, and he did this when he returned to CAPP. *Id.* Shelton testified later in the day he received a call

8

from an officer who asked about Victim Jenkins' girlfriend, and Shelton realized something must have happened to Victim Jenkins. *Id.* at 50. Shelton testified the CAPP general manager and he drove a photo of Victim Jenkin's girlfriend to Victim Jenkins' home, and they learned about his death. *Id.* Shelton testified he gave a statement to the police the next day, May 8, 2007. *Id.*

### 2. Testimony of Detective John Hoffner, Criminal Investigation Division of the Delaware County District Attorney's Office. *See generally* May 28, 2019 Notes of Testimony at pp. 55-115.

Detective John Hoffner ("Hoffner") testified he has been a police officer for approximately 40 years. Hoffner testified in 2007 he was working as a detective in Sharon Hill, Delaware County, PA. *Id.* at 56. Hoffner testified on May 7, 2007 around 12:30 p.m. he received a message from Officer Michael Attix requesting Hoffner and then Chief Joe Kelly to come to Victim Jenkins' home to investigate a body wrapped in a comforter on the second floor hallway of the house. *Id.* at 58. Hoffner testified Officer Attix left the house and waited until Hoffner arrived. *Id.* at 59. Hoffner testified when he and Attix went into the house there was "a pungent smell" he associated as the smell from a person who has been deceased for a period of time. *Id.* Hoffner testified they walked to the second floor and saw a "comforter wrapped tightly around a long object with a towel at one end" and after they removed the towel and began to unwrap the comforter, they saw "a human head that was quite mangled." *Id.* Hoffner testified they stopped, retreated downstairs, and contacted the

9

criminal investigation division ("CID") for homicide detectives and crime scene unit. *Id.* Hoffner testified his police department always requested CID for serious crimes and homicides because of their expertise. *Id.* at 60. Hoffner testified they secured the crime scene to preserve possible tampering of evidence. *Id.* at 60-61. Hoffner testified he is familiar with Victim Jenkins' home because he grew up four houses away. *Id.* at 61. Hoffner testified to a series of drawing and photographs depicting Victim Jenkins' home. *Id.* at 62, 63. Hoffner testified Victim Jenkins' body was found on the second floor right outside the middle bedroom door near the front bedroom, and it was securely wrapped in the comforter. *Id.* at 64. Hoffner testified to the content of several crime photographs, including a photograph of the newspapers and mail in the doorway. *Id.* at 67. Hoffner testified there is a certain method in taking crime scene photographs, and pictures are taken from multiple locations in the same room and they attempt to get every corner of the crime scene into the pictures. *Id.* at 72-73. Hoffner testified to photographs of Victim Jenkins, wrapped in the comforter with a towel over the top. *Id.* at 76. Hoffner testified to the presence of blood spatter on the trim of the middle bedroom door, blood stains on the door of the rear bedroom, and blood on the floor of the floor of the rear bedroom and on exercise equipment of the rear bedroom and on the radiator of the back bedroom, and blood stains and spatter on the party wall of the middle bedroom depicted in some photographs. *Id.* at 77, 82, 83, 84, and 85. Hoffner testified to the

10

photograph of a Batman comforter stained on the underside with blood. *Id.* at 86. Hoffner testified to a photograph of two dumbbells that had blood. *Id.* at 85, 87, 88. Hoffner testified the medical examiner was notified because of the death. *Id.* at 97. Hoffner testified to photographs of Victim Jenkins, after the comforter was removed from his body, face down. *Id.* at 98. Hoffner testified he wrote a report to document the steps of his investigation. *Id.* at 99. Hoffner testified the neighbors and relatives were contacted. *Id.* at 100-101. Hoffner testified blood samples were submitted for analysis and resulted in a DNA profile of a black, African American female, and they were able to exclude and rule out individuals as being the contributor of DNA recovered at Victim Jenkins' home. *Id.* at 102. On cross-examination, Hoffner testified a photograph of the dumbbells was an accurate depiction of how they were found on May 7, 2007. *Id.* at 114. Officer Hoffner testified he did not know whether any other person accessed the house during the period of time between Victim Jenkins' murder and Detective Attix finding the body. *Id.* at 144-115. On re-direct examination, Hoffner testified there was no evidence to suggest anyone other than the killer entered Victim Jenkins home between the time of the killing and Officer Attix responding to Victim Jenkins' home for the wellness call. *Id.* at 115.

11

### 3. Testimony of Officer Michael Attix, Police Officer for Borough of Sharon Hill, PA Police Department. *See generally* May 29, 2019 Notes of Testimony at 9-17.

Officer Michael Attix ("Attix") testified he has worked for the Sharon Hill Police Department for 29 years. *Id.* at 9. Attix testified on May 7, 2007, he was on duty and received a radio call for a wellness check at Victim Jenkins' home. *Id.* at 9-10. Attix testified when he arrived at Victim Jenkins' home, he noticed an accumulation of mail, newspapers, and flyers between the screen door and front door. *Id.* at 10. Attix testified he knocked on the door several times, and when there was no response, he went around the house to where there was a sliding glass door, and he started knocking again. *Id.* Attix testified when there still was no answer, he checked the sliding glass door and it opened; he stepped into the kitchen area and called for Victim Jenkins and announcing himself as a police officer. *Id.* at 11. Attix testified as he walked from the kitchen to the dining and living room area, he noticed there appeared to be drops of blood on the floor. *Id.* Attix testified he walked to the stairs, continuing to announce his presence and calling for Victim Jenkins, and proceeded up the stairs. *Id.* Attix testified when he nearly reached the top of the staircase, he observed an object, wrapped in a comforter and towel, in the hallway, and when he looked more closely, he saw blood on the ground where the object was and blood on the entranceway to a nearby room. *Id.* Attix testified he immediately left Victim Jenkins' residence and called for back up and requested the police radio

12

room to send the detective in chief. *Id.* at 12. Attix testified at first he thought the blood was significant because Victim Jenkins could have been hurt, and that when Attix went to the second floor, he realized it was a crime scene and he called for backup. *Id.* Attix testified he radioed for backup so they could clear the house to make sure no one was in the residence. *Id.* at 12-13. Attix testified he thought Officer Brian Patterson from Darby Township Police Department arrived, and they walked though Victim Jenkins' house. *Id.* Attix testified when entered the back bedroom on the second floor, he observed gym equipment and a large amount of blood on the walls and the floor. *Id.* Attix testified he and Officer Patterson did not find anyone else in Victim Jenkins' residence. *Id.* at 14. Attix testified once they cleared the house, both Officer Patterson and he exited the residence to await the detective in chief. *Id.* Attix testified when he and Officer Patterson were inside Victim Jenkins' house, they were mindful not to disturb evidence, not to step in blood, not to disturb anything, and they kept safety in mind. *Id.* Attix testified when he and Officer Patterson went back outside, Chief Kelly and Hoffner arrived. *Id.* at 15. Attix testified he advised Chief Kelly and Hoffner of his actions inside the residence, and he and Hoffner went back inside to check the object wrapped in a comforter and found in the second floor hallway. *Id.* Attix testified Hoffner checked to see what was under the towel and comforter, and it was Victim Jenkins. *Id.* at 15. Attix testified he and Hoffner went back outside, and no one was permitted to enter Victim

13

Jenkins' residence until CID detectives arrived. *Id.* On cross-examination, Attix testified it was a sunny day but he was not sure whether any lights were turned on in Victim Jenkins house and he does not remember whether he used his flashlight when he was inside Victim Jenkins' residence. *Id.* at 15-16. Cross-examination was not extensive and did not alter nor weaken the testimony of Attix. *Id.* at 16-17.

### 4. Testimony of Detective Sergeant David McDonald, Delaware County District Attorney's Office, Criminal Investigation Division. *See generally* May 29, 2019 Notes of Testimony at pp. 18-102.

Detective Sergeant David McDonald ("McDonald") testified he has been a police officer since 1984 and he is the Detective Sergeant, Commander of the Forensic Science Unit. *Id.* at 18. McDonald testified he became involved in the investigation into Victim Jenkins death on May 9, 2007[2] and he went to the scene of the murder for a walk through to identify items at the scene that may have evidentiary value and take additional photographs and process the scene for fingerprints. *Id.* at 22, 23, 73-74. McDonald testified to a series of photographs taken of the crime scene and evidentiary items. McDonald testified in his "preliminary survey there was a lot of blood evidence and a lot of bloodstain patterns". *Id.* at 29. McDonald testified the scene showed evidence of a violent struggle and appeared there had been an attempt to cleanse the scene, and he testified to content of a series of photographs depicting,

---

[2] Later during his testimony, McDonald testified he was mistaken and the exhibits reminded him his investigation actually started on May 8, 2007, the day after Victim Jenkins' body was discovered. *Id.* at 26.

14

*inter alia*, the bloody and violent crime scene of the murder. *Id.* at 29, 30, and generally. McDonald testified there were droplets of blood leading from the second floor into the kitchen and this could signify the "doer injured themselves". *Id.* McDonald testified an air freshener was out on a table and this appeared to be an attempt by someone to mask the odor of the decomposition process. *Id.* at 29-30. McDonald testified there were two 30 pound metal dumbbells, one was covered with a considerable amount of blood and the other appeared to have cast-off blood on its surface. *Id.* at 33. McDonald testified the crime scene was very bloody, and they took special precautions to avoid contamination of the crime scene by wearing protective covers over their boots and rubber gloves. *Id.* at 35. McDonald testified they took random samples of blood droplets for DNA testing. *Id.* at 44. McDonald testified there was a kitchen knife found on the drying rack in the kitchen, and there were bloodstains on the handle and the knife blade was bent consistent with being used in a struggle. *Id.* at 81. McDonald testified that he was not positive, however, the knife was used in the struggle. *Id.* On cross-examination, McDonald testified the first officers who went into the house without protective clothing could possibly contaminate the scene but the priority at that time was to make sure nobody was at risk. *Id.* at 86. On re-cross-examination, McDonald testified the blood was dry but McDonald could not testify how long the body was there, but he had information Victim Jenkins had not reported to work in over a week. *Id.* at 96.

15

**5. Testimony of Shante Fernandez, Daughter of Victim Jenkins' Girlfriend.** *See generally* May 29, 2019 Notes of Testimony at 110-151.

Shante Fernandez ("Fernandez") testified her mother and Victim Jenkins were in a relationship together from the time she was three until his death when she was 24, and Victim Jenkins was "like a step-father" to her. *Id.* at 110. Fernandez testified she and her mother lived with Victim Jenkins starting in 2000, but she moved out in 2003 because she was having a baby and there wasn't enough space in the house. *Id.* at 111. Fernandez testified she knows Appellant and identified Appellant. *Id.* at 113-114. Fernandez testified they met when they were fourteen years old, before Fernandez and her mom moved in with Victim Jenkins. *Id.* at 114. Fernandez testified she and Appellant were friends, spent time together, and talked on the phone regularly. *Id.* at 115. Fernandez testified Victim Jenkins would not allow company generally, but sometimes when Victim Jenkins was not home, Appellant would come over. *Id.* at 116. Fernandez testified sometimes Appellant would come over to meet her and they would go out, and at those times Victim Jenkins sometimes was home. *Id.* Fernandez testified she, her mother, and Victim Jenkins would use the back sliding glass door, and usually it was not locked. *Id.* at 117. Fernandez testified she and Izena were friends "on and off" because each of them moved around frequently and would lose touch or they would get new phone numbers, but they would reconnect through Facebook. *Id.* at 119. Fernandez testified in April 2007,

16

Appellant called her and asked if Victim Jenkins had an alarm system and if anybody ever went to visit him. *Id.* at 120. Fernandez testified she thought Appellant's phone call and questions were weird because Fernandez herself had no reason to go back to Victim Jenkins' house, so it was "really weird" for Appellant to call out of the blue and ask about Gary. *Id.* at 121. Fernandez testified she was not aware of any direct contact between Victim Jenkins and Appellant, and she had no reason to think they were in communication between 2003 and 2007. *Id.* Fernandez testified she learned of Victim Jenkins' death from her sister. *Id.* at 122. Fernandez testified she "taken aback" at the news, and the police talked to her a short time later. *Id.* Fernandez testified no one asked her about Appellant. *Id.* Fernandez testified the police took a DNA sample from her. *Id.* at 123. Fernandez testified her next contact with the police took place in 2015. *Id.* Fernandez testified Appellant and she were in contact around that time and Appellant was living in New York, but they never talked about Victim Jenkins between 2007 and 2015. *Id.* Fernandez testified she never thought and it never occurred to her that Appellant murdered Victim Jenkins. *Id.* at 124. Fernandez testified Appellant called her the day the police went to see her in New York. *Id.* at 125. Fernandez testified Appellant asked her whether Victim Jenkins was dead and Fernandez sent to Appellant a link for the article about Victim Jenkins' death. *Id.* Fernandez testified Appellant told her the police said Appellant's DNA was found and Appellant should confess. *Id.* Fernandez testified she spoke to

17

the police and found out Appellant's DNA was found at Victim Jenkins' house. *Id.* at 126. Fernandez testified Appellant claimed the DNA was not hers, and it would be impossible for her DNA to be found there. *Id.* at 127. Fernandez testified the few times Appellant did come to the house, Appellant never lifted weights. *Id.* On cross-examination Fernandez testified Appellant's weight loss may have occurred when she enlisted in the army. *Id.* at 130. Fernandez testified she and Appellant are old friends, and when they reconnect it is as if no time has passed. *Id.* at 138. Fernandez testified she told the police during her second conversation with police in 2015 about the April 2007 phone call she had with Appellant about whether Victim Jenkins had a security system in his house, and that Appellant has denied ever making asking those questions. *Id.* at 139, 140. Fernandez testified she told Appellant she was afraid she was going to lose her children because of this case. *Id.* at 139. Fernandez testified there were times Appellant claimed she didn't like Victim Jenkins and he was mean. *Id.* at 140. On re-direct examination, Fernandez testified when the police came to speak with her on September 29, 2015, Detective Wright gave her his card and told her to call him if she remembered anything; the next day, Fernandez called Detective right because she remembered the April 2007 phone call when Appellant asked her about whether Victim Jenkins had an alarm system in the house; when Fernandez remembered the conversation, it was an "aha moment" and she wasn't trying to hold back from the police, she just didn't think of it at first. *Id.* at 145.

18

### 6. Testimony of Heather McKiernan, Employee for the Center for Forensic Science Research and Education and Consultant for NMS Labs. *See generally* May 29, 2019 Notes of Testimony at pp. 152-197.

Heather McKiernan ("McKiernan") testified she has been employed since 2014 as an employee for the Center for Forensic Science and a consultant for NMS Labs. *Id.* at 152-153. McKiernan testified she has specialized training in DNA forensic analysis. *Id.* at 156. McKiernan testified about the summary of the serological testing for body fluid (blood) and results following DNA testing. *Id.* at 162. McKiernan testified both Appellant's reference sample and Victim Jenkins' reference sample were compared to and identified as present in a blood sample taken from the handle of the 30 pound dumbbell found at the scene of the murder. *Id.* at 166, 171, 172, 174. McKiernan testified Appellant's DNA was identified from a blood sample from the living room floor and the kitchen floor, and swabs from a bite mark found on Victim Jenkins. *Id.* at 175, 176, 177, 178, 179. McKiernan testified the conclusions and opinions she stated are in keeping with standards in the scientific community. *Id.* at 184. On cross-examination, McKiernan testified she could not say how Appellant's DNA got onto the dumbbell, who touched it first, or how long it has been on the dumbbell. *Id.* at 188. McKiernan testified and confirmed Appellant's blood was found in four places that were sampled for DNA: dumbbell, kitchen floor, living room, bite mark. *Id.* at 189. McKiernan testified the knife found in the kitchen had DNA sources of two persons, Victim Jenkins and an unknown individual. *Id.* at

19

195. On re-cross examination McKiernan testified she did not know whether that knife was used as the murder weapon. *Id.* at 197.

### 7. Testimony of Dara Rayna Jones[3], Appellant's Former Girlfriend. *See generally* May 29, 2019 Notes of Testimony at pp. 200-215.

Dara Rayna Jones ("Jones") testified she lives in New York and she knows Appellant; she identified Appellant in court. *Id.* at 200. Jones testified Appellant and she dated in 2013 and moved in together during that summer. *Id.* at 201. Jones testified Appellant and she broke up on New Year's Eve 2013. *Id.* at 203. Jones testified Appellant told her she had killed a man once and had beaten the man to death. *Id.* Jones testified she thought Appellant was using a scare tactic, trying to intimidate her. *Id.* at 204. Jones testified she began to research online about an unrelated and separate matter, and she came upon information related to the Victim Jenkins murder. *Id.* at 206. Jones testified she called the police. *Id.* at 205-207. On cross examination, Jones testified at first she did not believe Appellant when Appellant claimed to have killed a man. *Id.* at 207. Jones testified she did "not recall anybody saying anything about stabbing anybody." *Id.* at 212.

---

[3] In the Notes of Testimony, Dara Rayna Jones is identified as Barina Jones.

**8. Testimony of Detective William Wright, Criminal Investigation Division of Delaware County District Attorney's Office.** *See generally* May 30, 2019 Notes of Testimony at pp. 3-24.

Detective William Wright (Wright") testified he is Lieutenant of Detectives for Delaware County Criminal Investigation Division ("CID"), he has been employed with CID for eight years and has been a police officer for 29 years. *Id.* at 3-4. Wright testified he came into this case in 2015 as a result of Appellant's DNA presence at the crime scene where Victim Jenkins' body was found, including the bite mark on Victim Jenkins' arm, the blood drops on the floor, and the dumbbell. *Id.* at 4. The DNA profile found at the crime scene "allowed us enough probable cause to get a search warrant to get a buccal swab" from Appellant. *Id.* Wright testified in September 2015 he traveled with Chief Herron from Sharon Hill Police Department to New York City and with the aid of an Assistant District Attorney and a NYPD Officer Balbone, a search warrant was obtained in New York City. *Id.* at 5. Wright testified he and the two officers located Appellant and NYPD Officer Balbone did the buccal swab in Wright's unmarked police vehicle. *Id.* Wright testified he told Appellant the search warrant for the buccal swab was for an investigation of a 2007 homicide. *Id.* at 6. Wright testified Appellant stated he wouldn't be surprised if Appellant's DNA was found at the crime scene location because Appellant knew Fernandez and hung out at the house years earlier. *Id.* at 7. Wright testified following the buccal swab, he advised Appellant the DNA located

21

at the crime scene came from blood. *Id.* Wright testified Appellant got out of the car and ran away. *Id.* Wright testified the swab was submitted to NMS lab. *Id.* at 7, 8. Wright testified an arrest warrant was issued for Appellant, and Wright testified he wrote an incident report and criminal complaint. *Id.* at 8. Wright testified Hoffner and Chief Herron traveled to New York City where Appellant resided and with the assistance from NYPD and U.S. Marshals arrested Appellant. *Id.* at 9-10. Wright testified Appellant was *Mirandized* and an hour long interview was conducted. *Id.* at 10-12. Wright testified Appellant repeatedly claimed he was never at Victim Jenkins' home is 2007 and Appellant talked about his drug use—marijuana, medication, cocaine. *Id.* at 12. Wright testified Appellant acknowledged making a phone call about whether a person had an alarm system and Appellant did not confirm she was inquiring about Victim Jenkins. *Id.* at 13. Wright testified following the interview, they transported Appellant to Delaware County. *Id.* at 14. Wright testified there wasn't any evidence tending to suggest anyone else besides Victim Jenkins and Appellant were inside the house at the time of the murder. *Id.* On cross-examination, Wright testified, *inter alia*, to the general circumstances surrounding the police interview of Appellant following arrest but the cross-examination did not reveal anything irregular surrounding the arrest and subsequent interview of Appellant. *Id.* at 19-21.

22

**9. Testimony of Frederic Hellman, Chief Medical Examiner for Delaware County.** *See generally* May 30, 2019 Notes of Testimony at pp. 24-35, 42-91.

Frederic Hellman ("Hellman") testified for the past 19 years he has been employed as the chief medical examiner for Delaware County. *Id.* at 24. Hellman testified he conducted an autopsy on the body of Victim Jenkins, and he noted decompositional changes, approximately 40 incised and stab wounds all over Victim Jenkins' head and body, severe blunt force injuries including a gaping laceration that extended across his forehead, and an underlying depressed skull fracture of the left forehead that extended across the forehead bone to the right side of the skull. *Id.* at 24, 45, 46, 47. Hellman testified there was a second area of impact at the back of Victim Jenkins' head. *Id.* at 47. Hellman testified to large areas of bruising on the back of the head and extensive fractures of the skull arising from at least two and probably more blunt force injuries of the head. *Id.* at 47, 48. Hellman testified he observed scrapes and abrasions on Victim Jenkins' head, face, and body. *Id.* at 48. Hellman testified Victim Jenkins had a gaping slash wound across his neck that severed the carotid artery and jugular vein and fractured the hyoid bone. *Id.* Hellman testified the physical indications suggest Victim Jenkins was alive when he suffered the neck wound. *Id.* In addition to the stab and incised wounds, Victim Jenkins had a bite mark from which he collected a DNA sample. *Id.* at 52, 53. Hellman testified the evidence suggests Victim Jenkins was alive when he sustained the blunt force

23

injuries. *Id.* at 53. Hellman testified a thirty pound dumbbell could have been used to inflict the blunt force injuries to Victim Jenkins and the slash wound at the neck was an execution style slash. *Id.* at 54. Hellman through his testimony explained to the jury how he conducted the autopsy, and used diagrams and photographs to further explain the nature and type of the injuries Victim Jenkins sustained during the murder. *Id.* at 58-71. Hellman testified his opinion to a reasonable degree of medical certainty as to the cause of Victim Jenkins death is blunt force head injuries associated with multiple stab and slash wounds. *Id.* at 72. Hellman testified he received toxicology results from a specimen he sent to lab and the result showed Victim Jenkins has the presence of alcohol in his system, and he opined the level of alcohol was in part due to drinking and in part due to alcohol producing bacteria from decomposition. *Id.* at 73-74. Hellman testified he is not able to pinpoint an exact time of death but he estimated Victim Jenkins was deceased for 7 to 10 days before his body was discovered. *Id.* at 74. On cross examination, Hellman testified it appeared there was a progressive escalation of the nature and severity of the injuries suffered by Victim Jenkins and the injuries likely were sustained at the end of the struggle. *Id.* at 78, 79.

## B. DEFENDANT'S CASE

**1. Testimony of Appellant.** *See generally* May 30, 2019 Notes of Testimony at pp. 98-171.

Appellant testified he is 35 years old, has taken some college classes, and was in the Army National Guard out of New York. *Id.* at 99. Appellant testified in 2007 he was living in Brooklyn, NY, but came to Chester in 2007 to see friends and family. *Id.* at 100. Appellant testified he was born female, now identifies as a male, uses the name Isaiah, and characterizes as transgender. *Id.* at 100, 101. Appellant testified in 2014 he started receiving testosterone shots and in 2015 Appellant underwent a bilateral mastectomy. *Id.* at 102. Appellant testified in 2007, he was a 23 year old woman. *Id.* Appellant testified he feared rejection from the family because he perceived they had difficulty understanding his "alternate sexual preference". *Id.* at 103. Appellant testified he know Victim Jenkins because Victim Jenkins was dating Karen Crenshaw, mother of Appellant's friend Fernandez. *Id.* Appellant testified to having been in Victim Jenkins' home on several occasions. *Id.* Appellant testified on April 28, 2007 he went to Victim Jenkins' home, and he remembers the date because an "altercation ensued there" and Appellant was treated at Crozer Hospital for an injury to her leg and her hand. *Id.* at 104, 125, 156. Appellant testified on April 28, 2007 she was visiting family and friends in the area, including Fernandez, and they were drinking heavily. *Id.* at 107. Appellant testified she decided to go back to her aunt's home where she was staying because she drank

25

too much and was feeling sick. *Id.* at 108. Appellant testified she was taking the bus from Darby to Chester, but she began to get sick and was vomiting so she had to get off. *Id.* Appellant testified she wasn't far from where she thought her friend Fernandez's mom lived. *Id.* at 109. Appellant testified she knocked on Victim Jenkins' door, he answered, and after a minute, he recognized her. *Id.* Appellant testified he asked Victim Jenkins if she could use the bathroom and make a phone call. *Id.* at 110-111. Appellant testified Victim Jenkins allowed Appellant to come into the home. *Id.* at 111. Appellant testified she was in the home and making small talk with Victim Jenkins, and she needed to use the bathroom again. *Id.* Appellant testified Victim Jenkins invited Appellant to stay, but Appellant said she felt it was inappropriate and advised Victim Jenkins she probably wouldn't stay. *Id.* at 112. Appellant testified Victim Jenkins startled her because when she came to the bathroom door, he was right there, and then he "started to kind of hit on me." *Id.* Appellant testified they were talking about Appellant's sexuality, and Victim Jenkins asked, *inter alia*, if Fernandez and Appellant had been girlfriends and lovers, and whether they had sex at his house. *Id.* at 114. Appellant testified she had been molested by more than one male relative. *Id.* at 115. Appellant testified one of the big reasons for her to not stay with Victim Jenkins is because of the effect it could have on her relationship with Fernandez. *Id.* at 116. Appellant testified Victim Jenkins put his arms around her, and she felt both excited and

26

uncomfortable and tried to stop him when he began "grabbing my breasts and my genitals." *Id.* at p. 117. Appellant testified Victim Jenkins was persistent, and Appellant became angered so Appellant shoved Victim Jenkins as hard as she could and then punched him in the face. *Id.* at p. 118. Appellant testified Victim Jenkins at first appeared stunned, and hurt, and then he became angry. *Id.* Appellant testified they began physically fighting. *Id.* Appellant testified Victim Jenkins grabbed Appellant's neck and squeezed her into unconsciousness. *Id* at. 119. Appellant testified the altercation occurred in the upstairs hallway, but when she regained consciousness, she was in the bedroom, and she was on the bed and she was only wearing a tee-shirt. *Id.* at 119, 120. Appellant testified Victim Jenkins "was crouched down on top of me with penis in hand, pissing on me." *Id.* at 120. Appellant testified when Victim Jenkins saw she was regaining consciousness, he held a box cutter to her and he leaned into the neck, and she bit his arm as hard as she could. *Id.* Appellant testified they continued tussling, and she ended up on her stomach, and she was trying to get away. *Id.* Appellant testified Victim Jenkins then "tried to insert his penis into me" and he put it into her rectum. *Id.* at 121. Appellant testified when she tried to get away he pulled her hair out, and as she continued to attempt to get away, she tried to kick him as hard as she could in his genitals and then he slashed open her leg. *Id.* Appellant testified as she was backing away from him, she picked up a barbell and she told Victim Jenkins to "get the

27

fuck out of my way" and "if you don't get out of my fucking way, I'm going to bust your fucking head open." Appellant testified Victim Jenkins laughed at her and made a retort. Appellant testified "I started swinging that damn thing like I was the Louisville slugger. And I did not stop hitting him with it until he fell." *Id.* at 122. Appellant testified it is possible she hit Victim Jenkins in the body and head with the dumbbell. *Id.* at 123. Appellant denied stabbing Victim Jenkins. *Id.* at 123, 134. Appellant testified she grabbed her pants and flip flops from the hallway floor and went out of the house. *Id.* Appellant testified she discarded her urine stained tee shirt in the kitchen and put on her pants when she went outside. *Id.* at 124. Appellant testified Victim Jenkins was alive and calling her a fucking bitch when she was leaving, and Appellant then told Victim Jenkins "he was going to get fucked up." *Id.* Appellant testified she had a puncture wound to her hand and a gash in her leg, and she received eighteen to twenty stitches. *Id.* at 125. Appellant testified she did not know whether Victim Jenkins was bleeding when she left the house. *Id.* Appellant testified when she left, she didn't have her identification, keys, or money, and she had to walk to Chester from Victim Jenkins house. *Id.* at 126. Appellant testified she told her aunt she had been attacked and she went to Crozer. *Id.* at pp. 127, 128. Appellant testified she told the hospital staff she had been in a fight but did not tell them she had been sexually assaulted because it was humiliating and she did not want to have a rape kit and she did not want to tell the

28

police. *Id.* Appellant testified she told her aunt and her father what happened. *Id.* at 131. Appellant testified her father drove from Brooklyn to get her and Appellant showed him where Victim Jenkins lived. *Id.* Appellant testified her father did not go into Victim Jenkins house, and they drove to Brooklyn. *Id.* at 132, 133. Appellant testified when she visited her father the following week, he had her ID card and told her "he broke the nigger's face and he took the nigger out". *Id.* at 134. Appellant testified her father died in May 2016. *Id.* Appellant testified she hit Victim Jenkins with the dumbbell and she "imagined some of it did got to the face and head." *Id.* at 135. Appellant testified "I'm responsible for his death, but I did not kill him." *Id.* at p. 136. Appellant testified if she never took her dad to the house, Victim Jenkins probably would still be alive. *Id.* Appellant testified she wanted Victim Jenkins to be hurt, not dead. *Id.*

On cross-examination, Appellant testified he never mentioned any of her story to the detectives who obtained the buccal swab from her in September 2015. *Id.* at 137. Appellant testified following her encounter with the police, she called Fernandez and asked her if Gary were dead. *Id.* at 139. Appellant testified she had met Victim Jenkins a handful of times before April 28, 2007. *Id.* at 141, 142. Appellant testified Fernandez was mistaken when she testified Victim Jenkins was never at the home when Appellant visited. *Id.* at 142. Appellant testified she doesn't know what time she arrived at Victim Jenkins home, but she recalled it was getting

29

dark. *Id.* at 143. Appellant testified she was wearing a tee shirt, sweatpants, flip flops, and a blouse, and she carried a book bag. *Id.* at 143, 144. Appellant testified when Victim Jenkins progressed in touching her, when Appellant couldn't stand it any longer, she shoved him and pushed him, and then she punched him. *Id.* at 147, 148. Appellant testified after she punched Appellant, he began hitting and punching her and grabbed her around the neck and squeezed until she was unconscious. *Id.* at 148, 149. Appellant testified when was became conscious, she was in the hallway and Victim Jenkins was over her urinating on her. *Id.* at 149. Appellant testified she doesn't know if Victim Jenkins purposely or accidentally inserted his penis into her. *Id.* at 150. Appellant testified she agreed there were no images of the box cutter or her hair or the urine soaked tee shirt in the many pictures of the crime scene. *Id.* at 152. Appellant testified he hit Victim Jenkins with the dumbbell but he did Appellant didn't have a knife. *Id.* at 153. Appellant testified she took off her tee shirt because it was soaked in Victim Jenkins' urine and she threw it in the kitchen or the kitchen doorway to the outside. *Id.* at 154. Appellant testified he thought it would be "unintelligent to implicate myself" into the murder, and she thought if she said anything about her story and the situation that led up to the murder, then she would have to explain and she wasn't prepared for that. *Id.* at 158. Appellant testified she admits to hitting Victim Jenkins, but she denies any involvement in a stabbing of Victim Jenkins. *Id.* at 160. Appellant testified it is his fault Victim

30

Jenkins is dead, and he takes responsibility for that, but he did not murder Victim Jenkins. *Id.* at 160, 161. Appellant testified she did not take the opportunity to explain to the police her version of what she alleges happened. *Id.* at 161. Appellant testified Fernandez conflated two phone calls into one, and her recollection concerning Appellant's phone call to her inquiring whether Victim Jenkins had an alarm system is mistaken. *Id.* at 162, 163, 164. Appellant testified she called Fernandez on May 4, 2007, and was trying to find out information in an indirect manner about Victim Jenkins, and when Fernandez didn't say anything about him, Appellant "deduced he had survived the ordeal my father had spoken about." *Id.* at 165. Appellant testified Jones' testimony was mistaken, and Appellant had told her she was responsible for a man's death but explained she didn't commit murder or say she beat a man to death. *Id.* at 167. Appellant testified when she went to the hospital she tried to give facts without giving details. *Id.* Appellant testified she provided truthful information to the hospital staff. *Id.* at 168, 169. Appellant testified she didn't report to hospital staff information about having been strangled to the point of unconsciousness. *Id.* at 169.

2. **Testimony of Eugenia Bright, Appellant's Aunt.** *See generally* May 30, 2019 Notes of Testimony at pp. 172-178.

Eugenia Bright ("Bright") testified she is Appellant's aunt and she recalled one night during 2007 Appellant came to her home at night and was dressed in a different way than she normally was dressed and had a "horrid" look about her.

31

Bright testified Appellant told her she had been in a "really big fight" and she had a big gash on her leg, and Bright asked her son to drive Appellant to the emergency room. Bright testified she would not come to court and lie on behalf of Appellant. On cross-examination, Bright testified she did not call the police and Appellant told her to not call the police.

### 3. Testimony of Ethel Atkins, Appellant's grandmother. *See generally* May 39, 2019 Notes of Testimony at pp. 179-185.

Ethel Atkins ("Atkins") testified she is Appellant's grandmother and she lives in Crown Heights, Brooklyn, New York. Atkins testified Appellant graduated from West Philly High and joined the army. Atkins testified about the contents of two photographs of Appellant from her high school graduation and swearing in ceremony when she joined the army. Atkins testified in April 2007 Appellant's father brought her from Chester, PA to Brooklyn, NY, and Appellant was unable to take care of herself and she was limping, throwing up, and sore, and Appellant told Atkins she had been raped. Atkins testified she would not come to court, take an oath, and lie for Appellant.

C. **STIPULATIONS:** Two stipulations were entered between the Assistant District Attorney and Appellant through his Defense Counsel, and these stipulations were agreed to the entry by the Court to be made a part of the record of the case.

32

### 1. Chain of Custody—DNA Evidence

There has been a proper chain of custody established with respect to all DNA evidence in connection with this case, starting from the time when such evidence was collected, until the time when it was analyzed and/or presented in court.

### 2. Chain of Custody--Physical Evidence

There has been a proper chain of custody established with respect to all physical evidence collected in connection with this case, starting from the time such evidence was collected until the time when it was analyzed/presented in court.

After listening to all the trial testimony, considering all the exhibits admitted and weighing the evidence presented during trial, the jury believed the facts presented by the Commonwealth's case proved beyond a reasonable doubt Appellant committed the crimes charged and were not persuaded Appellant's version of the facts negated or curtailed Appellant's guilt on the criminal charges. Judgment of sentence should be affirmed.

## III. <u>DISCUSSION</u>

> **A. Evidence is sufficient to establish Appellant's guilt and sustain the convictions for murder of the first degree, murder of the third degree, and possessing instruments of crime. Appellant's claim lacks merit and judgment of sentence should be affirmed.**

The first three issues raised by Appellant in the 1925(b) Statement challenge sufficiency of the evidence for the convictions of murder of the first degree, murder of the third degree, and possessing instruments of crime. A claim challenging the

33

sufficiency of evidence is a question of law and the standard of review in a criminal case is whether the evidence is sufficient to prove every element of the case beyond a reasonable doubt. The scope is the entire record viewed in a light most favorable to the Commonwealth as the verdict winner, and accepting all evidence as true and all reasonable inferences therefrom upon which, if believed, is sufficient to prove guilt beyond reasonable doubt of all elements of the crime and the fact finder could have based its verdict. *Commonwealth v. Pruitt,* 951 A.2d 307, 313 (Pa. 2008); *Commonwealth v. Smith,* 853 A.2d 1020 (Pa. Super. 2004); *Commonwealth v. Wilson,* 825 A.2d 710 (Pa. Super. 2003). In reviewing a claim of insufficiency of the evidence, an appellate court must keep in mind that the credibility of witnesses and the weight to be accorded to the evidence produced are matters within the province of the trier of fact, who is free to believe all, some, or none of the evidence. *Commonwealth v. McCalman,* 795 A.2d 412 (Pa. Super. 2002), appeal denied 812 A.2d 1228 (Pa. 2002); *Commonwealth v. Hunter,* 768 A.2d 1136 (Pa. Super. 2001), appeal denied 796 A.2d 979 (Pa. 2001).

Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Lynch,* 2014 WL 11022453 (Pa. Super. 2014); *Commonwealth v. Franklin,* 69 A.3d 719, 722 (Pa.

34

Super. 2013) (citations and quotation marks omitted); *Commonwealth v. Rose,* 820 A.2d 164 (Pa. Super. 2003), reargument denied.

A claim challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Pennsylvania Constitution. *Tibbs v. Florida,* 457 U.S. 31 (1982); *Commonwealth v. Vogel,* 461 A.2d 604 (Pa. 1983). When a verdict is not supported by sufficient evidence, appropriate remedy is discharge and dismissal of all charges. *Commonwealth v. Ruffin,* 463 A.2d 1117 (Pa. Super. 1983); *Commonwealth v. Cardona,* 463 A.2d 11 (Pa. Super. 1983).

Appellant's sufficiency of the evidence claims lack merit and judgment of sentence should be affirmed. Considering the standard of review in this case, and based on the testimony presented, the Commonwealth met its burden is the verdict is supported by overwhelming evidence proving Appellant's guilt. The record and applicable law belie Appellant's claims. In the present case, viewing the evidence in the light most favorable to the Commonwealth, the record is clear the jury as fact finder determined the evidence required to establish the elements of the crimes of murder of the first degree, murder of the third degree, and possessing instruments of crime was sufficient to prove the charges beyond a reasonable doubt. The jury believed the testimony of the Commonwealth witnesses and believed the

35

Commonwealth proved beyond a reasonable doubt Appellant committed the offenses of murder of the first degree, murder of the third degree, and possessing instruments of crime. The jury as fact finder believed Appellant committed the crimes and disregarded Appellant's discordant testimony. The jury considered the details testified to concerning when the witness from Victim Jenkins place of employment realized Victim Jenkins had not been to work nor had he been in any communication. The jury considered the violent, bloody crime scene and Victim Jenkins' manner of death. The jury considered Hellman's testimony Victim Jenkins was alive when his throat was slashed, jugular vein and carotid artery severed, and hyoid bone broken and all the autopsy findings. The jury considered the testimony concerning the attempt to clean up the murder scene and mask odors. The jury considered Fernandez's testimony including Appellant's inquiry in advance of the murder whether Victim Jenkins' home had an alarm system and whether anyone else was staying at his residence. The jury considered Jones' testimony Appellant told her he killed a man by beating him to death. The jury considered testimony the blood samples removed from the scene of the murder matched Victim Jenkins and a "Black African American female". The jury considered Appellant testified on direct examination after Victim Jenkins choked her, she was on the bed when she regained consciousness, but on cross-examination, Appellant testified when she regained consciousness, Appellant was over the threshold of the door to the bedroom. *See*

36

May 30, 2019 Notes of Testimony at 121, 149. The jury considered Appellant's testimony admitting on April 28, 2007 she went to Victim Jenkins' home. The jury considered Appellant's testimony he is responsible for Victim Jenkins death; the jury considered Appellant's testimony he denies murdering Victim Jenkins; the jury considered Appellant's testimony blaming his father, who died in 2016, as the person who actually murdered Victim Jenkins. *Id.* at p. 134, 136. The jury considered Appellant repeatedly and admittedly "started swinging that damn thing [dumbbell] like I was the Louisville slugger. And I did not stop hitting him [Victim Jenkins] until he fell" and the jury considered Hellman's testimony there were approximately 40 stab wounds and an execution style slash across Victim Jenkins' neck. The jury also considered Appellant's refusal to make the connection his admitted behavior is a direct cause of Victim Jenkins' death. *Id.* at 122. The jury considered the dumbbell found at the scene of the murder was covered in blood and used in the murder of Victim Jenkins. The jury considered Appellant's testimony he wanted Victim Jenkins to hurt. *Id.* at 136. The jury considered Medical Examiner Hellman's testimony the blunt force injuries were the most severe injuries, the crushing blows eventually would result in death, and the blunt force trauma to the head rendered Victim Jenkins unconscious and made him vulnerable to the slash wound to the neck. *Id.* at 47, 56, 57. The jury believed, contrary to Appellant's testimony denying he stabbed Victim Jenkins and denying he used a knife, Appellant caused Victim

37

Jenkins' execution style neck wound and this is the direct cause Victim Jenkins' death. *Id.* at 57. The jury considered Appellant testified he knew Victim Jenkins was dead because in 2007 Appellant's father told Appellant "he broke the nigger's face and took the nigger out" but Appellant testified she called Fernandez in 2015 after her encounter with the police and asked if Victim Jenkins were dead. *Id.* at 134, 139. The jury considered Appellant testimony alleging both Jones and Fernandez were mistaken when they presented their testimony. *Id.* at 166, 167. The jury considered Appellant's testimony conflicts with the evidence presented in the case. The jury considered all the evidence and agreed the Commonwealth proved beyond a reasonable doubt the murder was willful, deliberate, premeditated, and committed with malice and the death of Victim Jenkins was caused by Appellant. The jury considered Appellant's use of the dumbbell and a knife in the commission of the murder and found them to be used for criminal purposes and possessed by Appellant under circumstances not manifestly appropriate for lawful uses they might have. The jury as fact finder did not find the evidence presented by the Commonwealth weak or inconclusive, and the totality of the evidence when viewed in the light most favorable to the Commonwealth sufficiently proves beyond a reasonable doubt each element of his conviction for murder of the first degree, murder of the third degree, and possessing instruments of crime.

Appellant's claims lack merit, and judgment of sentence should be affirmed.

38

**B. The trial court did not err when it denied Appellant's Motions *in Limine*.[4] Appellant's claims lack merit and judgment of sentence should be affirmed.**

The next three issues raised by Appellant in the 1925(b) Statement challenge the court's denial of Appellant's May 17, 2019 Motions *in Limine*: 1) "Motion *in Limine* with Respect to the Testimony of Dara Jones" in which Appellant requested the court to exclude testimony from Ms. Jones that her relationship with Appellant was volatile and "culminated in a criminal conviction" for Izena Goudy; 2) "Motion *in Limine* with Respect a portion of a Statement Made to Police by Witness Shante Fernandez" in which Appellant requested the court to exclude testimony from witness Fernandez concerning Appellant's inquiry of Victim Gary Jenkins had a security system in his home; 3) "Motion *in Limine* with Respect to the Presence of the Defendant's DNA in the National Databank" in which Appellant requested the court to preclude testimony at trial any mention of the Combined DNA Index System (CODIS) and how Appellant's DNA got entered into that system.

When a trial court's ruling on a motion *in limine* is challenged, the standard of review is whether the court committed abuse of discretion. *Commonwealth v. Stokes*, 78 A.3d 644 (Pa. Super. 2013), *Commonwealth v. Albrecht*, 720 A.2d 793 (Pa. 1999). The first question to consider is whether the evidence sought to be excluded is relevant, and whether the probative value of that evidence outweighs any

---

[4] On May 30, 2019, the Court entered written orders denying Appellant's May 17, 2019 Motions *in Limine*.

39

unfair prejudice. If it is determined the evidence was admitted in error, the question becomes whether the error is harmless, *i.e.*, is the admitted evidence unfairly prejudicial. In order to constitute reversible error, an evidentiary ruling must not only be erroneous, but also unfairly prejudicial to the complaining party. *Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998), *cert. denied*, 528 U.S. 1082 (2000).

The rules governing whether evidence is relevant are set forth in the Pennsylvania Rules of Evidence. Pa.R.E. 401 provides Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

The "Official Commentary" Pa.R.E. 401 provides in relevant part:

whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles and the other testimony offered in the case.

Pa.R.E. 402 (General Admissibility of Relevant Evidence) provides: All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible.

The "Official Commentary" to Pa.R.E. 402 provides in relevant part:

Relevant evidence may be excluded by operation of law, by statute, by these rules, by other rules promulgated by the Supreme Court or by rules of evidence created by case law.

40

Appellant asserts the court erred in denying the motions *in limine* and alleges the evidence was unfairly prejudicial to Appeallant pursuant to Pa.Rs.E. 403 and 404(b). Pa.R.E. 403 "Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, Waste of Time, or Other Reasons" provides in relevant part: The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice…The rule defines "unfair prejudice" as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially". Pa.R.E. 403.

Pa.R.E. 404(b) Character evidence; Crimes or Other Acts provides in relevant part:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of a mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3) Notice in a Criminal Case. In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

41

**1. Motion *in Limine* with Respect to the Testimony of Dara Jones**

On May 17, 2019, Appellant filed a "Motion in Limine with Respect to the Testimony of Dara Jones" in which Appellant requested the court to exclude testimony from Ms. Jones that her relationship with Appellant was volatile and "culminated in a criminal conviction" for Izena Goudy. On May 24, 2019, prior to jury selection, the court heard argument on the motion, and with agreement of counsel, decided if the issue arose during the trial, it would be addressed at that time. *See* May 24, 2019 Notes of Testimony at p. 19. The court did not abuse its discretion when it postponed addressing the motion until the issue concerning witness Jones relationship with Appellant was volatile and "culminated in a criminal conviction" for Appellant might be raised during witness Jones' testimony. In addition, the attorney for the Commonwealth indicated to the court and defense counsel he "will instruct the witness prior to their testifying that she is not to testify with regard to any alleged physical assault that occurred between them resulting in criminal charges." *Id.* A review of the witness testimony reveals the issue of the volatile nature of their relationship and subsequent criminal charges and conviction were never brought up during Jones' testimony and did not come up during the trial. Contrary to Appellant's statement "Jones was permitted to testify that her relationship with Appellant was volatile. PaR.E. 403 and 404(b)", the issue concerning the volatile nature of their relationship, in fact, did not arise during

42

witness Jones' testimony nor any other time during trial. Appellant's allegation Jones was permitted to testify about the volatile nature of her relationship with Appellant is not supported in the record, there was no testimony concerning a volatile relationship between witness Jones and Appellant, and Appellant did not suffer unfair prejudice and was not harmed in the absence of the testimony. Even if witness Jones had testified to the volatile nature of her relationship with Appellant, the testimony could be detrimental to Appellant without being unfairly prejudicial, and the court would not have abused its discretion in permitting the testimony. Appellant's claim lacks merit and judgment of sentence should be affirmed.

## 2. Motion *In Limine* with Respect to a Portion of a Statement Made to Police by Witness Shante Fernandez

On May 17, 2019, Appellant filed a "Motion in Limine with Respect a portion of a Statement Made to Police by Witness Shante Fernandez" in which Appellant requested the court to exclude testimony from Fernandez concerning Appellant's inquiry of Victim Jenkins had a security system in his home and whether he lived alone. On May 24, 2019, prior to jury selection, the court heard argument on the motion. *Id.* at 19. Appellant claims when police spoke to Fernandez in 2007, she did not mention that Appellant had allegedly indicated to her or called her several weeks before the homicide to inquire about who lived with Victim Jenkins and whether or not he had an alarm system. Appellant claimed this testimony although relevant should be excluded because of its unfairly prejudicial nature. Appellant pointed out

43

Fernandez had three interviews with the police; the first in 2007; the second in September 2015 in which Fernandez had no recollection of the particulars of any conversations she had with Appellant; the third the day after the second interview but eight years after the murder in which Fernandez indicated she had a conversation with Appellant in which Appellant asked Fernandez whether Victim Jenkins's house had an alarm system.

The trial court denied the motion indicating the issues concerning the time-frame of the statements and the lack of mentioning about the alarm system until the third conversation with the police could be addressed on cross-examination, and they are not so prejudicial as to affect the Commonwealth's right to call witness Fernandez. During the trial, before Fernandez testified, Appellant questioned whether the Motion *in Limine* was denied; the Court reiterated the motion was denied but Appellant would be permitted to thoroughly cross-examine Fernandez on the issue concerning Appellant calling Fernandez and asking about the presence of an alarm system and whether Victim Jenkins lived alone. *See* May 29, 2019 Notes of Testimony at p. 103. The trial court has broad discretion with regard to the admissibility of evidence, and it is not required to exclude all evidence that may be detrimental to Appellant. Appellant argued Witness Fernandez testified Appellant called her in April 2007 and asked if Gary Jenkins had an alarm system and if anyone ever visits Gary or spends time at his house. Appellant through counsel had the

44

opportunity to cross-examine witness Fernandez concerning her statement, and he did thoroughly cross-examine the witness. *Id.* at 132-154. A review of the Notes of Testimony reveals Appellant testified to the phone call and attempted to rationalize and impugn Fernandez's testimony by testifying Fernandez was mistaken in her recollection and had conflated two separate and distinct phone calls made several weeks apart. *Id.* at 162-164.

Appellant does not have to like the fact the court made a decision against him; the court has broad discretion regarding the admissibility of evidence, including evidence that may be considered detrimental to Appellant. The court did not abuse its discretion in denying Appellant's motion and making the determination Fernandez could testify about the phone call from Appellant concerning the existence of an alarm system at Victim Jenkins' house, and Appellant did not suffer unfair prejudice as a result of the trial court's decision. Although the testimony may have been detrimental to Appellant, it had probative value and was not so unfairly prejudicial to warrant exclusion. Appellant's claim lacks merit and judgment of sentence should be affirmed.

3. Motion *in Limine* with Respect to the Presence of the Defendant's DNA in the National Databank

On May 17, 2019, Appellant filed a "Motion in Limine with Respect to the Presence of the Defendant's DNA in the National Databank" in which Appellant requested the court to preclude testimony at trial any mention of the Combined DNA

45

Index System (CODIS) and how Appellant's DNA got entered into that system. On May 24, 2019, prior to jury selection, the court heard argument on the motion, and decided with agreement of counsel, if the issue arose during the trial, it would be addressed at that time. *Id.* at 19. The court reminded counsel Appellant could object to the introduction of testimony concerning the DNA database if it was brought in an inappropriate manner. During the Commonwealth's case and the testimony of Detective William Wright who testified he obtained Appellant's DNA pursuant to a search warrant for a buccal swab DNA collection from Appellant to compare to DNA found at the crime scene, there never was any testimony concerning a database of any kind, and therefore Appellant did not suffer any prejudice. Appellant's claim lacks merit and judgment of sentence should be affirmed.

**C.     Appellant claims the Commonwealth improperly replied to Appellant's allocution by stating the physical evidence was at odds with allocution and contained no remorse. Appellant's claim lacks merit and judgment of sentence should be affirmed.**

Appellant claims the Commonwealth improperly replied to Appellant's allocution when it stated the physical evidence was at odds with allocution and allocution contained no remorse. *See* July 16, 2019 Notes of Testimony at p. 19.

Pa.R.Crim.P. 704(C)(1) provides in relevant part: "at the time of sentencing, the judge shall afford the defendant the opportunity to make a statement in his or her behalf and shall afford counsel for both parties the opportunity to present information and argument relative to sentencing." 42 Pa.C.S.A. § 9752(a)(2)

46

provides: "as soon as practicable after the determination of guilt and the examination of any presentence report, a proceeding shall be held at which the court shall afford to the defendant the right to make a statement." *See also Commonwealth v. Thomas*, 553 A.2d 918 (Pa. 1989).

A review of the transcripts from the July 16, 2019 Sentencing proceeding reveals Appellant allocated for several minutes without interruption, and the following exchange among the court, attorney for the Commonwealth DeNucci, and attorney for Appellant Taggart:

THE COURT: Mr. DeNucci, anything else?

MR. DENUCCI: Judge, I just want to point out that the physical evidence is completely at odds with the Defendant's recitation of events.

THE COURT: Well, I can't consider anything other than what the jury did. The jury found the person guilty of 1st degree Murder. That's what he's going to be sentenced on. And that's what we have in front of me today. There's no retrying the case at sentencing.

MR. DENUCCI: I understand that, judge, but there's also — there's been no display of remorse of any kind.

MR TAGGART: Your Honor, I object to the District Attorney responding to his right of allocution. He has a right of allocution without cross-examination or second-guessing.

THE COURT: I appreciate that. Thank you. … .

*See* July 16, 2019 Notes of Testimony at pp. 19-20.

47

The record is replete and resplendent with Appellant's allocution. Appellant's right to allocution was not compromised, and Appellant was not interrupted during allocution. *Id.* at pp. 15-19. The judge heard and listened to Appellant's allocution. The trial court during the sentencing hearing did not consider the statements of the attorney for the Commonwealth immediately following Appellant's allocution. The record demonstrates the Court, immediately following the attorney for the Commonwealth's statements concerning the physical evidence *vis a vis* Appellant's recitation of events and absence of remorse, disregarded them. Appellant's claim lacks merit and judgment of sentence should be affirmed.

## IV. <u>CONCLUSION</u>

For all the foregoing reasons, Judgment of Sentence should be affirmed.

**BY THE COURT:**

**RICHARD M. CAPPELLI, J.**

cc:    A. Sheldon Kovach, Esquire, Deputy District Attorney, Delaware County
       District Attorney's Office (via: Interoffice and E-mail)
       Kelly Wilson, Appeals Unit Coordinator, Delaware County District
       Attorney's Office (via: Interoffice and E-mail)
       Richard J. Blasetti, Esquire, Attorney for Defendant, Office of the Public
       Defender (via: Interoffice and E-mail)

48